[Cite as *State ex rel. Daniels v. Hinkson*, 2025-Ohio-3058.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

STATE OF OHIO, EX REL. DARONCE :  CASE NO.  C-240688
M. DANIELS,

             :

  Relator,

             :    *JUDGMENT ENTRY*

  vs.

             :

KAREN HINKSTON,

             :

  Respondent.

             :

This cause was heard upon the petition for a writ of quo warranto, the answer, and the additional evidence and written argument submitted by the parties.

For the reasons set forth in the Opinion filed this date, the petition for a writ of quo warranto is granted.

Further, the court orders that costs are to be taxed under Civ.R. 54(D).

The court further orders the clerk serve notice of the judgment upon all parties as required by Civ.R. 58(B).


**To the clerk:**

**Enter upon the journal of the court on 8/27/2025 per order of the court.**


**By:**_____
   **Administrative Judge**

[Cite as *State ex rel. Daniels v. Hinkson*, 2025-Ohio-3058.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

STATE OF OHIO, EX REL. DARONCE M. DANIELS,

Relator,

vs.

KAREN HINKSTON,

Respondent.

CASE NO. C-240688

*OPINION*

Original Action in Quo Warranto

Judgment of the Court Is: Writ Granted

Date of Judgment Entry on Appeal: August 27, 2025

*Straus Troy, Co., LPA, Matthew W. Fellerhoff* and *Alexa Wainscott,* for Relator,

*Reminger Co., LPA, Ian D. Mitchell* and *James M. Schirmer*, for Respondent.

**Bock, Judge.**

**{¶1}** In this original action, relator Daronce M. Daniels seeks a writ of quo warranto ousting respondent Karen Hinkston from Daniels's seat on the Village of Lincoln Heights City Council ("the Council"). This matter is now before the court on the parties' cross-motions for summary judgment.

**{¶2}** Beginning in June 2024, Daniels, the Village of Lincoln Heights ("the Village") tax administrator D.O. Peterson, and the Village's law director, Deepak Desai, engaged in various communications regarding Daniels's outstanding municipal-tax liability owed to the Village. In September 2024, after concluding that Daniels had still not paid these outstanding taxes, Desai sent Daniels a letter informing him that due to his delinquent tax status, Daniels was not qualified to sit on the Council and Daniels had forfeited his seat. On December 2, 2024, Hinkston was sworn into Daniels's seat after being appointed by the Village's mayor.

**{¶3}** We conclude that the Village failed to comply with the relevant provisions of the Village's charter ("the Charter"), which required the Council to pass a resolution declaring Daniels's seat vacant to effectively remove Daniels from the seat. Because the Council did not comply with these procedures, Daniels was not legally removed from office and Hinkston's appointment to Daniels's seat was invalid. We accordingly grant Daniels's request for a writ.

## I. Factual and Procedural History

**{¶4}** The Village is a municipal corporation under Title VII of the Ohio Revised Code and is governed by the Charter. Voters elected Daniels to the Council in November 2021, and he was sworn in on January 1, 2022, for a term set to expire on December 31, 2025.

**A. Records indicated Daniels owed municipal income tax**

{¶5} The Village is a member of the Regional Income Tax Agency ("RITA"), which administers municipal-income-tax ordinances for member municipalities. RITA maintains an internal log for each taxpayer's account, which records calls, correspondence, payments, filings, and other actions.

{¶6} RITA's records showed that Daniels began his 2023 municipal tax return on April 22, 2024, but did not submit it until May 28, when he made a payment. In his deposition, Daniels testified that he believed he had paid his full 2023 tax liability in April 2024.

{¶7} According to RITA, it recognized an error in Daniels's tax return due to an improperly-listed residence, which when corrected resulted in an outstanding balance. In June 2024, RITA mailed an invoice for the outstanding amount to Daniels. In August 2024, RITA again mailed an invoice to Daniels for his outstanding tax bill and included a due date in September 2024. Daniels did not pay this amount by the set due date.

{¶8} On September 28, RITA recorded an online payment by Daniels. The next month, Daniels made another online payment. But RITA's records indicated that these two payments did not fully satisfy Daniels's tax obligation, so RITA sent Daniels an invoice for his remaining balance. RITA had no record that Daniels paid the remaining balance as of November 2024.

**B. Desai and Peterson told Daniels he needed to pay his taxes**

{¶9} In April 2024, Peterson sent Desai a list of the councilmembers, including Daniels, who had not paid their municipal income tax following the April 2024 deadline. In her deposition, Peterson explained that she had obtained this tax information from RITA and could not independently determine a person's tax status.

{¶10} Desai sent a text message to Daniels on April 22, informing Daniels that he was not compliant on his 2023 tax filing and that, under the Charter, Daniels was not qualified to serve on the Council because of his delinquent tax status. In May 2024, Peterson informed Desai that Daniels still had not paid his tax obligations and Desai again texted Daniels regarding the unpaid taxes.

{¶11} Desai emailed Daniels in early July 2024, stating that Daniels still owed taxes. Desai asked Daniels to resolve the tax obligation before the next Council meeting. Daniels responded that he would call RITA the next day. Daniels testified that he did call RITA the following day and stated that RITA informed him his taxes were "under review" at the time. A week later, Desai asked Daniels via text message for an update. Daniels responded, "They are looking into how the change was made and why it doesn't match." Ten days later, Desai again texted Daniels, explaining that he spoke with Peterson and the "[b]ottom line is that you owe approximately [] or maybe [] in taxes for 2023." In her deposition, Peterson could not recall providing specific numbers to Desai.

{¶12} Desai, Peterson, and the Village's interim manager, Mike Lemon, discussed Daniels's outstanding tax obligations. In an email, Lemon stated, "it appears it is time to enforce the rules of council on this matter."

{¶13} On July 22, 2024, Desai sent Daniels a letter stating that due to Daniels's continuing failure to pay his taxes, he was "no longer qualified to serve as a Member of Council." Desai also texted Daniels to inform him that he had sent the letter and Daniels responded, "I'm waiting to hear from Rita why the change once again. Haven't been given an answer on all the changes and who is responsible for all of them."

{¶14} Following Desai's July 22 letter, the Council met and voted on various

5

matters but did not take any formal action involving Daniels.

## C. Desai informed Daniels that Daniels had forfeited his seat

{¶15} On September 26, Desai sent another letter to Daniels stating that due to his continuing tax obligation, Daniels had forfeited his Council seat. Desai explained that the Village considered Daniels's seat vacant and would fill the seat.

{¶16} Daniels emailed Desai on September 30, reporting that his tax obligation had been paid. As noted above, RITA recorded an online payment by Daniels two days earlier. But according to RITA's records, this did not satisfy Daniels's entire tax obligation.

{¶17} Daniels appeared at a late October 2024 Council meeting. But he was not permitted to take his seat, participate, or vote.

{¶18} The Council never passed any resolution declaring Daniels's seat vacant.

## D. The Village's Mayor appointed Hinkston to Daniels's seat

{¶19} In November 2024, Daniels sued in the Hamilton County Court of Common Pleas, seeking (1) a declaration that his removal from his elected seat was unlawful, and (2) an injunction preventing the Village from filling his seat.

{¶20} On December 2, 2024, Hinkston was sworn in to fill Daniels's seat. Daniels filed this action for a writ of quo warranto eight days later.

## II. *Analysis*

{¶21} Daniels and Hinkston have both moved for summary judgment. Their arguments ultimately turn on whether the Charter allowed Daniels's seat to be filled without the Council first passing a resolution declaring his seat vacant. Hinkston further argues that Daniels's quo warranto claim is barred by the doctrine of laches. We address Hinkston's laches argument first then move to the merits.

## A. Summary-judgment standard

**{¶22}** Under Civ.R. 56(C), summary judgment shall be granted where (1) there are no genuine issues of material fact, (2) the movant is entitled to judgment as a matter of law, and (3) when viewing the evidence most strongly in the nonmovant's favor, reasonable minds can come to one conclusion, and that conclusion is adverse to the nonmovant.

**{¶23}** The summary-judgment movant bears the burden of informing the court of the basis of its motion and must further explain what evidence in the record demonstrates the "'absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims.'" *Weckel v. Cole + Russell Architects, Inc.*, 2024-Ohio-5111, ¶ 34 (1st Dist.), quoting *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). If the movant satisfies this burden, the nonmovant must then "'set forth specific facts showing that there is a genuine issue for trial.'" *Id.*, quoting *Dresher* at 293. When ruling on a motion for summary judgment, a court may not weigh the evidence or evaluate credibility as the purpose of summary judgment is solely to determine whether issues of material fact exist. *Id.*

## B. Writ of quo warranto

**{¶24}** Quo warranto "is the exclusive remedy by which one's right to hold a public office may be litigated." *State ex rel. Battin*, 40 Ohio St.3d 236, 238-239 (1988). To obtain a writ of quo warranto, a relator must show (1) the respondent unlawfully holds an office, (2) to which the relator is entitled, and (3) the relator has no adequate remedy in the ordinary course of the law. *State ex rel. Nguyen v. Lawson*, 2025-Ohio-507, ¶ 16.

**C. Laches**

**{¶25}** Hinkston argues that she is entitled to summary judgment because Daniels unreasonably delayed bringing this quo warranto action and his claim is accordingly barred by the doctrine of laches. She is incorrect.

**{¶26}** To establish the defense of laches, a party must show "(1) unreasonable delay or lapse of time in asserting a right, (2) absence of an excuse for the delay, (3) knowledge, actual or constructive, of the injury or wrong, and (4) prejudice to the other party." *Id.* at ¶ 17. Laches is an affirmative defense and the party asserting it bears the burden of establishing its applicability to the case. *Id.* at ¶ 18.

**{¶27}** Daniels was prevented from taking his seat in late-October 2024. In November 2024, Daniels filed for declaratory and injunctive relief to prevent the Village from filling his seat. On December 2, 2024, Hinkston was sworn into Daniel's seat. Daniels filed this action on December 10, 2024.

**{¶28}** Hinkston argues that Daniels knew in late-September 2024 that he lacked the qualifications to sit on the Council and accordingly should have filed his quo warranto claim a reasonable time after that point. But to establish entitlement to a writ of quo warranto, a relator must show that the respondent is unlawfully holding the relator's office. *Nguyen*, 2025-Ohio-507, at ¶ 16. Daniels's claim for a writ of quo warranto did not exist until Hinkston was appointed on December 2, 2024. Daniels could not have brought a quo warranto claim until that point. *See id.* at ¶ 22 ("Clement was purportedly appointed council president on March 13 and Lawson was purportedly appointed to Nguyen's council seat on March 21. Even if the city recognized these appointments as legitimate on those dates, Nguyen could not have filed her quo warranto action before those dates.").

**{¶29}** Daniels filed this action only eight days after Hinkston was appointed.

That was not an unreasonable delay. We hold that Daniels's claim and this action are not barred by laches.

**D. Daniels is entitled to a writ of quo warranto**

{¶30} Hinkston argues that she is entitled to summary judgment because Daniels is not legally entitled to his former seat. She asserts that Daniels's failure to pay his taxes resulted in his disqualification to sit on the Council and that Daniels's unreasonable delay in removing this disqualification resulted in his forfeiture of his seat by operation of law.

{¶31} Daniels, however, argues that the relevant Charter provision required the Council to pass a resolution formally removing Daniels and that because the Council never passed a resolution, he was never legally removed and Hinkston's appointment was improper. After a review of the Charter's text and the relevant case law, we conclude that Daniels has the better reading of the Charter.

*1. Daniels's tax liability*

{¶32} Section 2.02 of the Charter provides the qualifications necessary to sit on the Council. As relevant here, a person "who is not current on all tax filings with the Village . . . shall not be qualified to serve as a member of Council, or eligible to run for the office of Council member." Village of Lincoln Heights Charter, § 2.02.

{¶33} Daniels argues that Hinkston's motion for summary judgment should be denied because "[i]t is impossible to determine on this record or in this posture, both as a practical matter and within the confines of Civ.R. 56, whether Relator had potentially underpaid or even overpaid his taxes at any given time."

{¶34} But we need not resolve this dispute because, assuming without deciding that the evidence establishes that Daniels owed outstanding taxes at the time of his purported removal, the Village failed to comply with the Charter's provisions

9

when removing him.

### 2. *The Council had to act before Daniels's seat was forfeited*

{¶35} "[A]ny municipality may, through the adoption of a charter, enact legislation specifically designed to address the needs and desires of its residents." *Rispo Realty & Dev. Co. v. City of Parma*, 55 Ohio St.3d 101, 102 (1990); *see* Ohio Const., art. XVIII, § 3, 7. If a charter provides the manner in which a municipality removes its officers, the municipality must comply with the charter's removal provisions for the removal to be lawful. *See State ex rel. Gerhardt v. Krehbiel*, 38 Ohio St.2d 90, 94 (1974).

{¶36} "The interpretation of a city's charter is an issue of law." *City of Cincinnati v. State*, 2022-Ohio-1019, ¶ 11 (1st Dist.). We interpret a charter in accordance with general rules of statutory construction unless the charter provides otherwise. *Id.* "'Words and phrases shall be read in context and construed according to the rules of grammar and common usage. Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly.'" *Id.*, quoting R.C. 1.42.

{¶37} Two separate provisions in the Charter govern the removal of council members from their seats: Section 2.09 and Section 2.10. Both parties agree that Section 2.09 governing the "Forfeiture of Office" applies in this case, but they disagree about whether Section 2.09's application is automatic or requires Council action.

{¶38} Section 2.09 of the Charter, titled "Forfeiture of Office," provides, "If, at any time, a Council Member lacks any qualification for the office described in this Charter; or if he/she consistently fails to abide by the Rules of Council, he/she shall forfeit his/her office and his/her seat shall be declared vacant by resolution of Council, five members concurring."

{¶39} Section 2.10, titled "Removal and Vacancies," states,

The Council shall without delay declare vacant the seat of any member who shall cease to be a resident of the Municipality. Council may also declare vacant the seat of any member who persistently fails to abide by the Rules of Council or who is otherwise guilty of misconduct affecting the performance of his/her duties as a member of Council, but such action shall be taken only upon the concurrence of five members of Council at a regular meeting of the Council after service of notice upon such member of such proposed action at least seventy-two hours in advance of such meeting, at which he/she may present a defense.

{¶40} Section 2.10 goes on to provide that "Council vacancies shall be filled within sixty days by a vote of a majority of the remaining Council members. If Council fails to fill such vacancy within sixty days, the Mayor shall fill it by appointment."

### a. Hinkston's case law is not on point

{¶41} Hinkston, relying on cases interpreting statutory requirements for various elected officials, argues that Daniels's seat was forfeited by operation of law. But her cases did not interpret the specific language of the Village's Charter and are not dispositive—the Charter's specific language controls the outcome of this case. *See State ex rel. Corrigan v. Noble*, 26 Ohio St.3d 84, 85 (1986) ("It is axiomatic that interpretation of a municipality's charter is the crucial inquiry in determining the propriety of an official's removal from office where the charter addresses such contingency.").

{¶42} For instance, Hinkston argues this case is like *State ex rel. Wilson v. Gulvas*, 63 Ohio St.3d 600 (1992). In *Wilson*, a zoning board official moved out of the township. *Id.* at 601. R.C. 519.13 required that the zoning board members be residents

of the township but the statute did not "definitively state[] the effect of noncompliance with that requirement." *Id.* at 603. The Court turned to its "best assessment of the General Assembly's purpose, which must have been to assure that township zoning regulations are administered absolutely by the residents to which they apply." *Id.* The Court concluded, "This purpose does not permit a construction of R.C. 519.13 that allows even the possibility that a nonresident might continue to serve on a board of zoning appeals due to the township trustees' reluctance, for whatever reason, to initiate removal proceedings." *Id.* The Court accordingly held that the zoning board's seat was automatically vacated when the official moved out of the township. *Id.*

{¶43} *Wilson* is not on point. As the *Wilson* Court noted, there was no statutory language specifying the effect of a board member leaving the township. Here, the Charter specifically provides the qualifications to be a council member and includes specific language under Section 2.09 regarding the effect of a person's lack of qualifications: "he/she shall forfeit his/her office and his/her seat shall be declared vacant by resolution of Council, five members concurring." This court accordingly does not need to turn to its "best assessment" of the Village's purpose because the Village has used specific language expressing its purpose in Section 2.09.

{¶44} Hinkston also relies on *State ex rel. AG v. Orr*, 61 Ohio St. 384 (1899), which, like *Wilson*, held that a city council member automatically forfeited his seat when he moved outside of his ward. But that decision was based on the relevant city-charter provision, which provided that "a councilman who removes without his ward shall be deemed to have resigned his office." *Id.* at paragraph one of the syllabus. So *Orr* is not on point because the relevant charter provision there stated that the council member was "deemed to have resigned" by leaving the ward and the charter included no provision suggesting that a council vote was required. *Id.*

12

**{¶45}** Next, Hinkston points to cases interpreting Ohio's election laws. In *State ex rel. Vana v. Maple Hts. City Council*, 54 Ohio St.3d 91, 94 (1990), the Court, reviewing an equal-protection challenge to a city charter provision, explained, "[u]nder general Ohio election laws, a candidate for public office need not be qualified in order to run for that office, but must remove any disqualifications immediately upon assuming the office; otherwise, the officeholder forfeits that office."

**{¶46}** Hinkston cites to *Vana* to argue that Daniels was required to immediately remove his disqualification after it arose and that because he failed to do so, he automatically forfeited his seat. We note however that the *Vana* Court interpreted a charter provision prohibiting a council member from holding another public office and explained that because the relator "failed to remove his disqualification, his council seat *should be declared* vacant and forfeited." (Emphasis added.) *Id.* While the *Vana* Court did not state if the relevant charter provision explained the process for declaring a vacancy, *Vana* suggested that some action was necessary for the forfeiture to occur.

**{¶47}** Courts have applied *Vana*'s immediacy requirement to R.C. 2961.01(A), which provides that any person who is convicted of a felony "is incompetent . . . to hold an office of honor, trust, or profit." *See State ex rel. Powers v. Curtis*, 2003-Ohio-6104, ¶ 39 (12th Dist.). R.C. 2953.32, which provides for sealing of records, permits a person to remove a disqualification under R.C. 2961.01. *Powers* at ¶ 44. The *Powers* court held that, in the context of R.C. 2961.01, *Vana* allows "some reasonable length of time to clear the disqualification" because of the procedural requirements and court action needed to seal a record under R.C. 2953.32. *Id.* at ¶ 51. The *Powers* court concluded that the elected official's five-month delay between taking office and filing his sealing application was an unreasonable amount of time and did not meet *Vana*'s immediacy

requirement. *Id.* at ¶ 56.

**{¶48}** Additionally, the *Powers* court explained that R.C. 2961.01's disqualification operates automatically to vacate an elected official's seat and does not require a hearing under R.C. 3.07. *Powers* at ¶ 57, citing *Hughes v. Brown*, 62 Ohio App.3d 417, 421 (10th Dist. 1989). In *Hughes*, the court explained that, because a felony conviction is an "accomplished fact" not subject to dispute, "the Secretary of State has no discretion to disregard the felony conviction but must declare the office vacated." *Hughes* at 423.

**{¶49}** These cases are not controlling. First, Daniels's tax status, while certainly capable of assertion, is not an "accomplished fact" not subject to dispute. A felony conviction, however, results from a trial in which a defendant is afforded constitutional due-process protections. There is accordingly no need for a hearing or further action before removing an elected official due to a felony conviction because the official could not attempt to collaterally attack their conviction at a removal hearing. Further, *Power*'s five-month timeframe was based on the time requirements for sealing a conviction and is not directly capable of transposition onto a tax dispute. Finally, these cases interpreted a specific statute that is not at issue in this case. Considering the actual Charter language at issue here, Hinkston's preferred reading of Section 2.09 runs into several problems.

### b. The Chater's language supports Daniels's position

**{¶50}** First, Hinkson's reading would require the court to read the same words in different sections of the Charter differently. Sections 2.09 and 2.10 both provide the Council with the power to "declare vacant" a council member's seat. Hinkson argues that under Section 2.10, the Council's declaring a seat vacant operates to remove the council member from the Council. But Hinkson argues this identical language under

Section 2.09 has no purpose because 2.09 purportedly acts to automatically remove a disqualified council member. This goes against settled methods of statutory interpretation, which generally require that words or phrases should be given the same meaning throughout a document. *See Rhodes v. Weldy*, 46 Ohio St. 234, 243 (1889) ("It is a familiar principle of construction that a word repeatedly used in a statute, will be presumed to bear the same meaning throughout the statute, unless there is something to show that there is another meaning intended.").

**{¶51}** Notably, Section 2.10 uses the "declare vacant" phrase twice, first under the mandatory provision related to the residency requirement and then under the discretionary "may . . . declare vacant" provision allowing removal "of any member who persistently fails to abide by the Rules of Council or who is otherwise guilty of misconduct affecting the performance of his/her duties as a member of Council." The discretionary removal provision clearly recognizes that it is the council's act of "declaring vacant" that removes a council member. So, while Section 2.09's reference to the Council declaring vacant the seat may be ambiguous, that same phrase's latter use in Section 2.10 is not ambiguous. The two should be read the same. *See Rhodes* at 242 ("But where the same word or phrase is used more than once in the same act, especially in the same section and in the same sentence, in relation to the same subject-matter and looking to the same general purpose, it is a fundamental rule of statutory construction that if in one connection the meaning is clear and in the other it is otherwise doubtful or obscure, it is in the latter case to be construed the same as in the former.").

**{¶52}** Hinkson argues that Section 2.09 is an automatic removal mechanism while Section 2.10 provides the Council with discretionary power to remove a council member. But Section 2.10's first sentence specifically provides that the Council shall

"without delay declare vacant the seat of any member who shall cease to be a resident of the Municipality." Village residency is also a qualification requirement under Section 2.02. Under Hinkston's argument, a council member's leaving the Village should operate as an automatic forfeiture under Section 2.09. If that is the case, its inclusion under the removal mechanism in Section 2.10 makes little sense.

{¶53} Further, Hinkston's reading of Section 2.09 makes the phrase "and his/her seat shall be declared vacant by resolution of Council, five members concurring" meaningless. In interpreting statutory text, courts should not read any provision "as superfluous unless that is manifestly required, and the court should avoid that construction which renders a provision meaningless or inoperative." *Boley v. Goodyear Tire & Rubber Co.*, 2010-Ohio-2550, ¶ 21. And a "statute "'may not be restricted, constricted, qualified, narrowed, enlarged or abridged; significance and effect should, if possible, be accorded to every word, phrase, sentence and part of an act.'"" *Id.*, quoting *Weaver v. Edwin Shaw Hosp.*, 2004-Ohio-6549, ¶ 13, quoting *Wachendorf v. Shaver*, 149 Ohio St. 231 (1948), paragraph five of the syllabus.

{¶54} There are seven members of the Village Council. Under Hinkston's reading, Section 2.09 requires a supermajority vote to unnecessarily recognize something that has already happened. And notably, Section 2.10, which controls the filling of vacancies under Sections 2.09 and 2.10, provides that the Council may fill a vacancy "by a majority of the remaining Council members." So the Council does not need a supermajority vote to actually fill a vacancy, further rendering Section 2.09's ending phrase meaningless under Hinkston's reading. We decline to read Section 2.09 this way. We conclude that to create a vacancy by removing a council member from his or her seat, Section 2.09 requires the Council to pass a resolution doing so. There is no other reading of Section 2.09 that gives meaning to every phrase in the Charter

and consistently reads identical language in the Charter.

{¶55} Daniels argues that his reading of Section 2.09, which would require the Council to determine that one of its members is not qualified, is also consistent with R.C. 731.44, which provides that "legislative authority of a municipal corporation shall be the judge of the election and qualification of its members." Notably, Hinkson argues that Daniels had a "reasonable" amount of time to pay his taxes before his disqualification resulted in the forfeiture of his seat. But in this case, it was Desai, and apparently the Village interim manager, who made the determination of what a "reasonable time" was. We agree that, considering the amorphous nature of a "reasonable" time standard, placing with Council the discretion to judge the reasonableness of that timeframe is more consistent with R.C. 731.44 and explains Section 2.09's language requiring Council action regarding forfeiture and vacancy.

{¶56} Because Daniels's reading of Section 2.09 gives effect to all the words in the statute and reads similar phrases in Section 2.10 consistently, we agree with his reading of the Charter provision. We therefore hold that the Council was required to pass a resolution, with five members concurring, to vacate Daniels's seat. Because it did not, Daniels's removal was improper under the Charter and of no effect. *See Gerhardt*, 38 Ohio St.2d at 94 ("where a municipal charter prescribes the manner for removal of municipal officers, any attempt by the municipality's legislative body to remove an officer in a manner at variance or in conflict with the charter's directives is a nullity.").

{¶57} Further, Hinkston's appointment was improper as Daniels's seat was never lawfully vacated. *See State ex rel. Norman v. Viebranz*, 19 Ohio St.3d 146, 149 (1985) ("one cannot be duly appointed to an office where there is no vacancy, since two persons cannot, at the same time, occupy an office for which only one incumbent

is provided by law."). Hinkston is therefore unlawfully occupying Daniels's office and Daniels has established each element necessary for a writ of quo warranto.

**{¶58}** We deny Hinkston's motion for summary judgment, and grant Daniels's motion for summary judgment. Daniels is entitled to a writ of quo warranto and a judgment of ouster against Hinkston. *See* R.C. 2733.14 ("When a defendant in an action in quo warranto is found guilty of usurping, intruding into, or unlawfully holding or exercising an office, franchise, or privilege, judgment shall be rendered that he be ousted and excluded therefrom, and that the relator recover his costs."); *see also Battin*, 40 Ohio St.3d at 238 (explaining that ouster is the remedy afforded from the granting of a writ of quo warranto).

### III. Conclusion

**{¶59}** For the foregoing reasons, the court denies Hinkston's motion for summary judgment and grants Daniels's motion for summary judgment. We grant the writ of quo warranto to oust Hinkston from Daniels's seat on the Council and to reinstate Daniels to that seat.

Writ granted.

**CROUSE, P.J.,** and **MOORE, J.,** concur.