[Cite as *Wilson v. Durrani*, 2026-Ohio-2279.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


CAROL WILSON,                                  :     APPEAL NO.  C-250102
                                                     TRIAL NO.   A-1706419
     Plaintiff-Appellee,                      :

     vs.                                      :

ABUBAKAR ATIQ DURRANI, M.D.,                   :

     and                                      :

CENTER FOR ADVANCED SPINE                      :
TECHNOLOGIES,
                                               :
     Defendants-Appellants.
                                               :


MICHAEL CRAIL,                                 :     APPEAL NO.  C-250192
                                                     TRIAL NO.   A-1706529
     Plaintiff-Appellee,                      :

     vs.                                      :

ABUBAKAR ATIQ DURRANI, M.D.,                   :

     and                                      :

CENTER FOR ADVANCED SPINE                      :
TECHNOLOGIES,
                                               :
     Defendants-Appellants.
                                               :


DAVID SMITH,                                   :     APPEAL NO.  C-250193
                                                     TRIAL NO.   A-1706433
     Plaintiff-Appellee,                      :

     vs.                                      :     *JUDGMENT ENTRY*

ABUBAKAR ATIQ DURRANI, M.D.,     :

  and                           :

CENTER FOR ADVANCED SPINE    :
TECHNOLOGIES,

                                      :

    Defendants-Appellants.     :

This cause was heard upon the appeals, the records, the briefs, and arguments.

For the reasons set forth in the Opinion filed this date, the judgments of the trial court are reversed and the cause is remanded.

Further, the court holds that there were reasonable grounds for these appeals, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**
**Enter upon the journal of the court on 6/17/2026 per order of the court.**

**By:**_____
    **Administrative Judge**

[Cite as *Wilson v. Durrani*, 2026-Ohio-2279.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


CAROL WILSON,                         :       APPEAL NO.   C-250102
                                              TRIAL NO.    A-1706419
    Plaintiff-Appellee,          :

    vs.                          :

ABUBAKAR ATIQ DURRANI, M.D.,          :

    and                          :

CENTER FOR ADVANCED SPINE             :
TECHNOLOGIES,
                                      :

    Defendants-Appellants.       :

---

MICHAEL CRAIL,                        :       APPEAL NO.   C-250192
                                              TRIAL NO.    A-1706529
    Plaintiff-Appellee,          :

    vs.                          :

ABUBAKAR ATIQ DURRANI, M.D.,          :

    and                          :

CENTER FOR ADVANCED SPINE             :
TECHNOLOGIES,
                                      :

    Defendants-Appellants.       :

---

DAVID SMITH                           :       APPEAL NO.   C-250193
                                              TRIAL NO.    A-1706433
    Plaintiff-Appellee,          :

    vs.                          :       *O P I N I O N*

ABUBAKAR ATIQ DURRANI, M.D.,          :

# OHIO FIRST DISTRICT COURT OF APPEALS

and                                    :

CENTER FOR ADVANCED SPINE             :
TECHNOLOGIES,

                                       :

    Defendants-Appellants.         :


Civil Appeals From: Hamilton County Court of Common Pleas

Judgments Appealed From Are: Reversed and Cause Remanded

Date of Judgment Entry on Appeal: June 17, 2026


*Statman Harris LLC, Alan Statman,* and *Benjamin M. Maraan, II,* for Plaintiffs-Appellees,

*Taft Stettinius & Hollister LLP, Annie M. McClellan, Philip D. Williamson, Aaron M. Herzig,* and *Russell S. Sayre,* for Defendants-Appellants.

**KINSLEY, Presiding Judge.**

**{¶1}** Defendants-appellants Abubakar Atiq Durrani, M.D., and the Center for Advanced Spine Technologies, Inc. (together "Durrani") appeal the judgments of the Hamilton County Court of Common Pleas following jury verdicts in favor of plaintiffs-appellees Carol Wilson, Michael Crail, and David Smith (together "the plaintiffs").[1] The plaintiffs sued Durrani for negligence and other torts after he performed what they alleged were medically unnecessary back surgeries. The jury sided with the plaintiffs on their negligence claims—and with Wilson on additional claims—and awarded each of them substantial monetary damages.

**{¶2}** On appeal, Durrani raises ten assignments of error and a number of separate legal issues. One of those issues questions whether the plaintiffs' cases were properly tried together under Civ.R. 42(A). We have previously permitted the joinder of actions against Durrani for trial where the plaintiffs received the same or similar surgeries or premised their claims on common legal theories. *See, e.g., Puckett-Morrissette v. Durrani*, 2026-Ohio-1444, ¶ 11 (1st Dist.); *Jones v. Durrani*, 2024-Ohio-1776, ¶ 25 (1st Dist.). These cases, however, challenge the limits of our precedent. The plaintiffs here did not receive the same or similar surgeries—at least not in the way our prior cases have contemplated. And the jury's differing verdicts undercut the idea that their cases presented a common question of law.

**{¶3}** We therefore take a fresh look at our Civ.R. 42 precedent as it applies to the plaintiffs' cases here. Doing so reveals that the plaintiffs' cases were improperly joined for trial, because no common question of fact or law could be resolved with a single answer by the jury. We accordingly reverse the judgments of the trial court and

---

[1] We sua sponte consolidate these separate appeals into a single opinion and judgment.

remand the plaintiffs' cases to the trial court for individual trials.

*Background*

{¶4}    In 2017, Crail, Wilson, and Smith individually sued Durrani after he performed spinal surgeries on them. Each of their complaints included claims for battery, negligence, fraudulent misrepresentation, and lack of informed consent. The plaintiffs' complaints rested on a common narrative about Durrani's conduct: he had recommended and performed invasive surgeries that were not supported by their medical images.

{¶5}    The plaintiffs are three of hundreds of people who have advanced similar claims against Durrani. Frustrated by the lack of progress in bringing their claims to trial, in 2020, the plaintiffs and others who were suing Durrani filed a motion for group trials. Relying on our decision in *Siuda v. Howard*, 2002-Ohio-2292 (1st Dist.), they proposed that the trial court consolidate cases against Durrani for trial based on certain perceived commonalities. Attached to their motion for group trials was a document entitled "group trials in suggested priority list with commonality of facts and/or injury." This document suggested trying cases in which the patients had received surgeries on the C1/C2 levels of their spines first, followed by patients whose surgeries involved screws near the aorta. Other proposed criteria included the patient's age, the presence of retrograde ejaculation, whether the patient's insurance company had denied coverage for the procedure, whether the patient had left the informed consent form blank, and whether Durrani was late in dictating his operative notes.

{¶6}    Following the priority list was a document entitled "potential group trials." This document listed the names of individuals with pending cases against Durrani who could be grouped together for trial based on their injuries, surgeries,

6

ages, or other factors. In some instances, there were more than 20 or 30 individuals in a proposed group. Finally, the group-trial motions included a document entitled "cases ready for trial." Curiously, Wilson, Crail, and Smith were entirely omitted from the "potential group trials" list and the list of cases ready to be tried.

{¶7} On September 3, 2020, over Durrani's objection, the trial court granted the motion for group trials in principle. But it limited the method of consolidation to two- or three-plaintiff trials. In doing so, it noted that the individuals suing Durrani had proposed including up to ten plaintiffs' claims in a single trial. It rejected the idea of including that many cases at once but did not explain why. Instead, it merely observed that "Plaintiffs advance a number of reasons for group trials, some of which the Court should not and will not consider." It did not identify what those reasons were.

{¶8} The trial court's September 3, 2020 order required counsel for plaintiffs and counsel for Durrani to submit a proposed trial schedule with groups of two plaintiffs to be tried from January to February 2021 and groups of three plaintiffs to be tried from March to December 2021. It indicated that the proposed groupings were required to comply with Civ.R. 42.

{¶9} The record does not reflect that any proposed grouping was submitted in these specific plaintiffs' cases by the parties' attorney as required by the trial court's September 3, 2020 order. We therefore have no procedural understanding as to why Wilson's, Crail's, and Smith's cases were selected to be tried together. That confusion is compounded by the fact that the plaintiffs' cases were omitted from the lists attached to the group-trials motion.

{¶10} Nonetheless, on January 4, 2023, the trial court docketed a "seventh

7

revised joint trial schedule sequence" in the plaintiffs' cases.[2]  That document reflected that the plaintiffs' cases would be joined for a joint jury trial to begin on October 30, 2023.

{¶11}     On October 23, 2023, Durrani filed a memorandum in opposition to the consolidation of the plaintiffs' cases for trial.  In it, he highlighted that the trial court had failed to identify the common question of law or fact that connected the plaintiffs' cases.

{¶12}     The trial court took up Durrani's opposition at the start of the October 30, 2023 trial.  It inquired whether Durrani's expert witnesses would be testifying about all three plaintiffs' cases.  Durrani's attorney indicated that they would.  The trial court then ruled as follows:

> Given the fact that the witnesses are all the same, and the surgeries are
> similar, the Court at this time feels that consolidation, while the rule
> does not provide for automatic consolidation, it's left up to judicial
> discretion, and my feeling at this time is that it's – they should be
> consolidated, especially considering the Court has over 400 cases
> pending against Dr. Durrani, and one at a time we will never get them
> concluded.

### *Trial*

{¶13}     The plaintiffs' joint jury trial began on October 30, 2023 and lasted ten days.

{¶14}     Crail testified first.  Crail initially saw Durrani in 2011 for problems with his cervical spine.  In October of 2011, Durrani performed an anterior cervical

---

[2] The record does not contain any of the six prior joint trial schedule sequences.

discectomy at the C3/C4, C4/C5, and C7/T1 levels of Crail's spine. Following the surgery, Crail experienced severe pain that could not be controlled by pain medication. His condition had not improved by his two-week post-operative appointment. A course of physical therapy after surgery was essentially ineffective.

{¶15} Nine months later, in March of 2012, Crail again sought care from Durrani for a popping left knee. Durrani initially recommended injections, but when Crail did not improve, Durrani offered a second spine surgery to repair the nerve. Crail agreed, and Durrani performed a bilateral lumbar hemilaminectomy at the L4/L5 level in July of 2012. Crail again experienced post-operative difficulties following his second surgery. He developed temperature sensitivity, the tops of his feet burned, and he felt stabbing pain. Crail also suffered problems with sexual function.

{¶16} To address Crail's ongoing medical issues, his primary-care physician referred him to another doctor for pain management. Crail eventually opted for a spinal cord stimulator to manage his pain, which he still relied on at the time of his testimony.

{¶17} Crail testified that, following his surgeries with Durrani, he was unable to perform many of the activities he could do before. As an example, he distanced himself from his grandchildren because they would jump on him and exacerbate his pain. He started taking antidepressants to deal with the emotional impact of his condition. It was not until 2022 or 2023, well after Durrani operated, that he started to experience some relief.

{¶18} Smith testified at trial via Zoom from an inpatient addiction rehabilitation center. Smith had developed a chemical dependency to pain medication following his surgery with Durrani. Unlike Crail, who had seen Durrani for two operations, Smith underwent a single surgery—a lumbar laminectomy, foraminotomy,

and decompression—in February of 2012. Smith had been a brick mason for about 26 years, and his career left him with chronic lower-back pain.

**{¶19}** Durrani recommended fusion surgery the first time he examined Smith, telling Smith he would be wheelchair-bound without surgical intervention. But that was not the surgery Durrani ultimately performed.

**{¶20}** Following the operation, Smith was in so much pain that he was afraid to move. He treated the pain with narcotics, including Percocet. Eventually Smith developed a dependency to pain medication, leading to his inpatient stay at an out-of-state rehabilitation center. At the time of his testimony, Smith had not had a pill in five months. But he had lost his job, his fiancée, and his health insurance. He was receiving Social Security disability payments as a result of his condition.

**{¶21}** Wilson also testified by Zoom. She developed severe back pain after receiving an epidural during the birth of her second child by emergency c-section. Wilson first saw Durrani in 2009. He recommended surgery during her second visit, although she could not remember what kind. She had an understanding that he was going to "fix" her.

**{¶22}** In December 2010, Durrani performed a lumbar fusion at the L4/L5 level on Wilson. Following her surgery, Wilson was still in pain, became depressed, and felt worse than before. Durrani ultimately recommended a second surgery—an L5/S1 fusion and foraminotomy—which Wilson had in December of 2011. Following that surgery, Wilson was still not better.

**{¶23}** So in March 2012, Durrani sent Wilson for another MRI. He then recommended a third surgery, although Wilson was unclear as to why. In June of 2012, Durrani performed a hemilaminectomy and foraminotomy at the L3/L4 and L5/S1 levels. Wilson needed a fourth surgery to remove a tube from her hand.

**{¶24}** When Wilson saw Durrani in August of 2012, after her third spine surgery and fourth surgery overall, she was still in pain. Durrani suggested a fourth spine surgery. Fearing something was wrong, she refused.

**{¶25}** After leaving Durrani's care, Wilson received a referral from her family doctor to see a different physician, Dr. Cohen at the Mayfield Clinic. Dr. Cohen documented Wilson's chronic back pain and likely nerve damage. He referred her to another doctor for ongoing pain management.

**{¶26}** Wilson testified that Durrani's surgeries had left a lasting, negative mark on her life. She explained that, as a result of her successive surgeries, she could no longer do what she used to. She described her experience as a significant medical trauma. She required ongoing pain management and was the sole caregiver to her two children.

**{¶27}** After testifying themselves, the plaintiffs called three expert witnesses: Dr. Stephen Bloomfield, Dr. Keith Wilkey, and Dr. Ranjiv Saini.

**{¶28}** Dr. Bloomfield, a neurosurgeon, offered his expert opinion that surgery was contraindicated in Crail's and Wilson's cases. Regarding Crail, Dr. Bloomfield testified that he was not a good surgical candidate and that his discomfort would have been best addressed by a pain management center. Using Crail's radiological images as exhibits, Dr. Bloomfield explained that the surgeries Durrani performed were both medically unnecessary and unreasonable because Durrani had misinterpreted the images. Dr. Bloomfield further opined that Durrani misrepresented the need for surgery to Crail by exaggerating the radiological findings. As a result, Dr. Bloomfield concluded that Crail could not have offered appropriate informed consent, because Durrani had not accurately advised Crail of the results of his MRIs. In Dr. Bloomfield's opinion, Durrani caused acute, chronic, and permanent damage to Crail's spine by

operating unnecessarily.

{¶29} As to Wilson, Dr. Bloomfield's review of her MRI revealed no evidence of any condition that would cause back pain other than discogenic disease. He accordingly believed that Durrani exaggerated the findings of her radiological images to justify his recommendations for surgery. Similar to his opinion of Crail's case, Dr. Bloomfield concluded that Wilson could not validly offer informed consent to surgeries she did not need. Dr. Bloomfield also determined that Durrani's surgeries caused permanent changes to Wilson's spine, particularly at the site of the fusion.

{¶30} Dr. Wilkey, an orthopedic surgeon and the medical director of spine and neurosurgery at United Health Care, testified that surgery was medically unnecessary in all of the plaintiffs' cases. As to Smith, Dr. Wilkey opined that Durrani negligently misrepresented his medical images to induce him to undergo an unnecessary surgery. As a result, according to Dr. Wilkey, Smith could not provide informed consent. Dr. Wilkey was especially concerned because Durrani's operative notes indicated that he discussed the risks and benefits of surgery with Smith in the operating room. This was far too late in the process to allow Smith to weigh whether he consented to the procedure. Dr. Wilkey also believed that Durrani created lasting damage to Smith. Reviewing Smith's radiological images with the jury, Dr. Wilkey explained that Smith suffered from radicular pain after the procedure that he did not have before.

{¶31} Dr. Wilkey's opinion as to Crail was that Durrani had repeatedly lied about the severity of his findings and that Crail's surgeries were medically unnecessary. Dr. Wilkey also took issue with Crail's ability to provide informed consent, since his approval for the surgeries rested on false information. Dr. Wilkey also opined that Durrani left Crail worse off after surgery. Following his procedures, Crail developed new thigh pain and suffered from a damaged nerve root.

**{¶32}** Dr. Wilkey further testified that Wilson experienced permanent damage as a result of her surgeries with Durrani. She had developed scar tissue around her nerves that would likely cause lifelong pain. Dr. Wilkey opined that Durrani had incorrectly diagnosed Wilson, causing her to undergo medically unnecessary surgeries.

**{¶33}** Dr. Ranjiv Saini, M.D., a board certified neuroradiologist, reviewed all three plaintiffs' MRIs, x-rays, surgical notes, and medical files.

**{¶34}** In Crail's case, Dr. Saini testified that Durrani had exaggerated, misrepresented, and fabricated his findings. Durrani had diagnosed Crail with disc herniation at the C6/C7 level, as well as other problems at the C4/C5 level, but Dr. Saini found no evidence of these conditions in Crail's radiological imaging. Durrani also falsely diagnosed Crail with lumbar foraminal stenosis, a diagnosis he could not make without an MRI, which Crail had not had. Like Dr. Wilkey, Dr. Saini took issue with the fact that Durrani had obtained informed consent in the operating room. Dr. Saini also highlighted problems with Durrani's operative notes, which were vague and prepared far too late.

**{¶35}** Dr. Saini echoed his opinion that Durrani exaggerated and fabricated his findings in Wilson's case. After reviewing Wilson's radiological images, Dr. Saini opined that her surgeries were medically unnecessary, given that she had only minimal degenerative changes in her spine. Dr. Saini disputed Durrani's diagnosis of discogenic disease with foraminal stenosis, noting that the radiologist who originally reviewed Wilson's images found no evidence of disc herniation.

**{¶36}** Regarding Smith, Dr. Saini also opined that surgery was medically unnecessary and that Durrani had exaggerated his findings. Durrani diagnosed Smith with slippage of the L5/S1 disc based on an x-ray, but according to Dr. Saini, this

condition required a CT scan or MRI to diagnose. Dr. Saini also disputed Durrani's determination that Smith suffered from central spine stenosis based on his review of Smith's medical images.

**{¶37}** Following the presentation of the plaintiffs' expert witnesses, Durrani presented an expert of his own, Dr. Patrick McCormick, a neurosurgeon.[3] Regarding Wilson, Dr. McCormick opined that the surgeries performed by Durrani were medically appropriate and within the standard of care. He reviewed Wilson's radiological images and believed she suffered from degenerative changes at the L5/S1 level that would benefit from surgery. Dr. McCormick expressed that Wilson provided sufficient informed consent for her surgeries.

**{¶38}** Regarding Crail, Dr. McCormick also believed that surgery was a reasonable recommendation, as Crail suffered from cervical radiculopathy and a herniated disc. Having reviewed Crail's medical imaging, he opined that Durrani performed the surgeries with the care and skill of a reasonable surgeon.

**{¶39}** Regarding Smith, Dr. McCormick opined that Durrani's surgical recommendation was reasonable, because Smith suffered from L5/S1 radiculopathy and degenerative changes that could be treated operatively.

### *The Verdicts*

**{¶40}** The jury issued its verdicts on November 14, 2023.

**{¶41}** In Wilson's case, seven of eight jurors found Durrani liable for negligence, and six of eight jurors found him liable for battery, lack of informed consent, and fraudulent misrepresentation. The jury awarded Wilson a total of

[3] In closing arguments, the parties' counsel indicated that Dr. Derk Purcell also testified on Durrani's behalf. Dr. Purcell's testimony was not transcribed and does not appear in the record. We are unsure why not. As the appellant, Durrani bears the burden of ensuring that the record on appeal is complete. *See* App.R. 9(B)(1).

$801,085.41 in damages—$81,085.41 in past medical expenses, $240,000 in future medical expenses, and $480,000 in noneconomic damages.[4]

{¶42} In Crail's case, the same seven of eight jurors who found Durrani liable for negligence in Wilson's case also found Durrani liable for negligence against Crail. But the jury unanimously found in favor of Durrani on Crail's claims for battery, lack of informed consent, and fraudulent misrepresentation. For Durrani's negligence, the jury awarded Crail a total of $934,703.10 in damages—$74,703.10 in past medical expenses, $150,000 in future medical expenses, and $710,000 in noneconomic damages.[5] In reaching its damages determination, the jury concluded that Crail suffered a permanent physical deformity as a result of Durrani's negligence.

{¶43} In Smith's case, six of eight jurors found Durrani liable for negligence, but the unanimous jury rejected the remainder of Smith's claims against Durrani. Smith was awarded a total of $1,628,756.70 in damages—$13,756.70 in past medical expenses, $280,000 in future medical expenses, and $1,335,000 in noneconomic damages.[6]

{¶44} The jury declined to impose punitive damages or to award attorney fees in all three cases.[7]

{¶45} Following the jury's verdicts, Durrani moved for judgment notwithstanding the verdict ("JNOV") or, in the alternative, a new trial, in part due to his contention that the trial court improperly consolidated the plaintiffs' cases for trial. The trial court denied the motion, finding the joint trial to have been proper under Civ.R. 42(A). It based its determination on three key observations. First, the trial

---

[4] The trial court later reduced Wilson's noneconomic damages to $350,000, as required by R.C. 2323.43(A)(2).
[5] The trial court reduced Crail's noneconomic damages to $500,000.
[6] The trial court reduced Smith's noneconomic damages to $350,000.
[7] The parties later stipulated that each plaintiff was entitled to an award of $75,000 in attorney fees.

court held that "there was sufficient commonality of issues and parties to warrant the consolidation of these cases." It did not explain whether by "issues and parties" it meant that the plaintiffs' cases raised a common question of law or fact as required by Civ.R. 42(A) or instead satisfied some other standard. Second, it noted that all of the parties' expert witnesses offered testimony for and against each of the plaintiffs, "saving time and money in the presentation of evidence." Third, it noted that the jury was able to parse through the three plaintiffs' cases individually, because it allocated a different damage award to each plaintiff.

**{¶46}** Durrani appealed.

### *Analysis*

**{¶47}** On appeal, Durrani raises ten assignments of error. The first is that the trial court erred in joining the plaintiffs' cases for trial. We agree. And because we do, the remainder of Durrani's arguments on appeal are moot.

### A. *Joint Trials*

**{¶48}** Our analysis of when cases may be joined for trial begins with Civ.R. 42(A). That rule permits actions to be tried together if they involve "a common question of law or fact." Civ.R. 42(A). It sets no obvious limit on the number of cases that may be consolidated. Rather, if "*actions* before the court" satisfy the commonality standard, the trial court may join them for trial purposes. (Emphasis added.) *Id.*

**{¶49}** This court has considered the propriety of joint trials in a number of appeals involving Durrani. *See, e.g., Jones*, 2024-Ohio-1776 (1st Dist.); *Courtney v. Durrani*, 2025-Ohio-2335 (1st Dist.). Prior to these cases, there was very little precedent in Ohio defining the meaning of Civ.R. 42(A)'s common-question standard. In the absence of that guidance, nearly all courts that have upheld consolidation under Civ.R. 42(A) have done so without expressly holding that a common question of law

or a common question of fact binds the cases, much less identifying what that common question might be. *See, e.g., In re Cletus P. & Mary A. McCauley Irrevocable Trust*, 2014-Ohio-5123, ¶ 16 (5th Dist.) (affirming consolidation where cases presented a "commonality of issues"); *Clemente v. Gardner*, 2003-Ohio-6017, ¶ 18 (5th Dist.) (finding no abuse of discretion in consolidation because the same witnesses, evidence, and documents were presented in the consolidated cases). This court followed suit in the prior Durrani appeals, upholding joint trials without specially naming what specific common question of law or fact supported the trial court's ruling.

**{¶50}** Civ.R. 42(A) undoubtedly vests the trial court with discretion to consolidate matters for trial, with an eye to avoiding unnecessary costs or delay. *See Dir. of Hwys. v. Kleines*, 38 Ohio St.2d 317, 318 (1974). But a trial court cannot join cases that have no common question, even if doing so might be expedient. *Id.* at 320.

**{¶51}** In this regard, Civ.R. 42(A) establishes a two-step inquiry in determining when cases may be consolidated. First, the trial court must determine whether the actions being joined present a common question of law or fact. This inquiry falls within the sound discretion of the trial court. *See, e.g., Waterman v. Kitrick*, 60 Ohio App.3d 7, 14 (10th Dist. 1990). Second, if two or more actions present a common question, then the trial court may consolidate the actions. *See* Civ.R. 42(A) (indicating that consolidation is discretionary, even where actions present a common question of law or fact). In doing so, the trial court may consider the practicalities of consolidation, including whether the cases involve the same parties or witnesses, and weigh the risk of undue prejudice resulting from trying multiple cases to a single fact-finder. *See, e.g., Holiday v. Progressive Ins. Co.*, 2021 U.S. Dist. LEXIS 85792, *2 (D.Utah May 4, 2021) (describing second step of two-step consolidation inquiry under Fed.R.Civ.P. 42).

**{¶52}**    The threshold question under Civ.R. 42(A) is therefore whether the actions present a common question of law or fact.  Before a trial court considers, at step two whether consolidation under Civ.R. 42 is efficient, it must first determine whether the matters present a common question of law or fact.  So what exactly is a common question?

### 1.  *Common Question of Law*

**{¶53}**    In determining what the term "common question of law" means, longstanding rules of statutory construction tell us to look first at the meaning of the term itself.  *See Sears v. Weimer*, 143 Ohio St. 312, 316 (1944), paragraph five of the syllabus.  Thus, "[i]n statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself." *Food Marketing Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019).  Where the words in a rule or statue yield a clear meaning, courts must stop there.  *Id.*; *Jacobson v. Kaforey*, 2016-Ohio-8434, ¶ 8 ("[Courts] do not have the authority to dig deeper than the plain meaning of an unambiguous statute under the guise of either statutory interpretation or liberal construction.").  Consideration of a law's purpose, function, or history is therefore improper when a term is capable of application on its own.  *See id.*

**{¶54}**    In examining the meaning of the term "common question of law," the phrase has never been defined in the context of Civ.R. 42(A).  But that does not mean the term is without meaning.  More than 50 years ago, in *Kleines*, the Ohio Supreme Court defined a common question of law as an "issue[] of law requiring judicial

interpretation which [is] common to all" parties.[8] *Kleines*, 38 Ohio St.2d at 320. This explanation implies that a common question of law must be one for the court, rather than the jury. It also suggests that the issue of law must be resolved in common for all parties. But no court since *Kleines* has been so specific in its treatment of what the phrase "common question of law" means.

**{¶55}** In the absence of more specific authority, Ohio's class action rule provides a helpful analogy. Like Civ.R. 42(A), Civ.R. 23(A), which governs class actions, also relies on the existence of common questions of law or fact to justify class certification. A term used repeatedly throughout a rule is presumed to have the same meaning, absent some indication that the drafter intended a different message. *See State ex rel. Daniels v. Hinkston*, 2025-Ohio-3058, ¶ 50 (1st Dist.). We have no evidence that the common-question standard means something different in Civ.R. 23(A) than it means in Civ.R. 42(A), and so we find case law expanding upon its meaning in the class action context to be informative here.[9]

**{¶56}** With regard to class actions, courts have determined that the "common

---

[8] *Kleines* concerned the consolidation of four different cases brought by the highway director against various landowners to appropriate their land for the creation of a new roadway. *Kleines* at syllabus. The landowners were related by blood or marriage. *Id.* at paragraph three of the syllabus. Without describing the legal standards for appropriation under R.C. Ch. 5519, the Court concluded that no legal question could be resolved in common for all property owners and reversed the trial court's consolidation order as improper. *Id.* at 320.

[9] It is true that claims resolved by way of a class action under Civ.R. 23(A) lose their individual nature, while claims resolved by way of consolidation under Civ.R. 42(A) do not. *See, e.g., Gates v. Berger*, 1996 Ohio App. LEXIS 5175, *7-8 (10th Dist. Nov. 21, 1996). But we do not see this difference in procedure as a reason to give the phrases different meaning across the two rules. For one thing, the purpose of the rule is irrelevant to our interpretation when the text itself provides clear answers. *See Jacobson*, 2016-Ohio-8434, at ¶ 8. For another, commonality is not the only criteria that defines a class. Before individual claims may be consolidated for purposes of judgment under Civ.R. 23(A), the plaintiffs must establish that the class is sufficiently numerous that joining all members of the class in one suit is impracticable, that the named plaintiffs are representative of the class members, and that the named plaintiffs will fairly and adequately represent the class members' interests. *See* Civ.R. 23(A)(1)-(4). To the extent the rules serve different functions, these heightened criteria already protect against improper class certification. The fact that it is more difficult to certify a class than to consolidate individual actions mitigates against the need to interpret the common-question term differently across the two rules.

question of law" standard is satisfied when there is a common liability issue. *See, e.g., Hamilton v. Ohio Savs. Bank*, 82 Ohio St.3d 67, 77 (1998). This inquiry focuses on the basis for a defendant's liability and whether it is in common across the proposed class. *Grant v. Becton Dickinson & Co.*, 2003-Ohio-2826, ¶ 36 (10th Dist.). Variations in individual damages will not destroy commonality so long as the basis for liability is the same across class members. *Ayers v. KCI Technologies, Inc.*, 2019-Ohio-3614, ¶ 17 (11th Dist.). On the other hand, the mere existence of a common question about the defendant's liability is insufficient to support class certification. *Barrow v. New Miami*, 2016-Ohio-340, ¶ 28 (12th Dist.). Rather, the claims must have the potential to generate common *answers* that resolve the litigation. *Id.*

{¶57}    Combining *Kleines* and Civ.R. 23(A)—both sources of Ohio law—yields a number of observations about Civ.R. 42(A)'s common-question-of-law standard. First, the question of law must be one that can be resolved at once for all parties to the litigation, rather than piecemeal. *Kleines*, 38 Ohio St.2d at 320. Second, the question must relate to the defendant's liability. *Hamilton* at 77. Third, the answer to the question must be in common, or uniform, across the consolidated cases. *Barrow* at ¶ 28.

{¶58}    Our conclusion that Civ.R. 42(A) requires a single, common answer to the defendant's liability across consolidated cases is buttressed by case law construing the federal corollary to Ohio's consolidation rule. Like Ohio, the federal courts also permit cases to be joined for trial when they present a common question of law or fact. *See* Fed.R.Civ.P. 42(a)(1). And in this context, federal courts have long concluded that "the plain meaning of this phrase indicates that a common question is one that must be answered identically in each case in which it is presented." *Habitat Edn. Ctr., Inc. v. Kimball*, 250 F.R.D. 390, 394 (E.D. Wisc. 2008). Therefore, to determine whether

cases present a common question of law, a trial court must identify the elements of the relevant causes of action and evaluate which elements, if any, submit to common answers. *Neri v. Nissan N. Am., Inc.*, 122 F.4th 239, 246-247 (6th Cir. 2024). There is no common question of law where a decision-maker can answer "yes" in some cases and "no" in others. *Id.* at 247. Similarly, there is no common question if the plaintiffs must use different pieces of evidence to answer the question. *Id.*

{¶59} We accordingly hold that, to satisfy Civ.R. 42(A)'s common-question-of-law requirement, cases joined for trial must present at least one question about the defendant's liability that is capable of being resolved with one answer.

{¶60} We recognize that this holding may seem in tension with our precedent indicating that cases against Durrani present a common question of law when they raise "the same theory of malpractice and/or fraud." *See Jones*, 2024-Ohio-1776, at ¶ 25 (1st Dist.). This statement implies, without directly saying so, that merely advancing a similar basis for liability is sufficient to satisfy the commonality requirement of Civ.R. 42(A). The rule is not incorrect, insomuch as the inquiry into the basis for liability is the first step in commonality analysis. *See Ayers*, 2019-Ohio-3614, at ¶ 17 (11th Dist.). But, in our previous cases, we stopped there and did not further analyze whether the plaintiffs' cases were capable of resolution with a common answer. *See, e.g., Jones* at ¶ 25; *Courtney*, 2025-Ohio-2335, at ¶ 49 (1st Dist.).

{¶61} In observing that plaintiffs in previous cases against Durrani advanced the same theory of liability, we relied on our decision in *Siuda v. Howard*, 2002-Ohio-2292, ¶ 12 (1st Dist.). A closer look at *Siuda* is therefore instructive. In *Siuda*, the trial court consolidated 11 plaintiffs' medical malpractice cases against an ophthalmologist. *Id.* at ¶ 1, 2. The plaintiffs claimed that the ophthalmologist needlessly performed surgery. *Id.* at ¶ 30. But they also alleged that the opthamologist and his employer

engaged in a conspiracy to defraud them. *Id.* at ¶ 1. In presenting their case to the jury, at least four plaintiffs presented expert testimony that the ophthalmologist performed an outdated method of cataract surgery that had fallen out of favor in the medical community. *Id.* at ¶ 16, 55, 107 (noting that plaintiffs Hughes, Nickles, Himmelblau, and Thomas underwent YAG surgery). The *Siuda* court held that consolidation was proper because the cases against the ophthalmologist "set forth the same legal theories [and] would call upon similar expert testimony." *Id.* at ¶ 12.

**{¶62}** Our earlier Durrani cases imported the "same theory" standard directly from *Siuda. See Jones* at ¶ 25. That analysis was proper, because *Siuda* contained at least one common question that supported joinder—whether the ophthalmologist and his employer conspired to defraud patients. *Id.* at ¶ 1. The legal question of whether the ophthalmologist performed negligently by selecting an out-of-date surgical method was also in common across the plaintiffs' cases who had received that surgery. *Id.* at ¶ 16, 55, 107 (describing YAG surgery and identifying plaintiffs who underwent it). *Siuda*'s analysis is therefore consistent with *Kleines* and our understanding that the term "common question of law" requires a common finding of liability. Thus, we see our holding today as an extension of our earlier Civ.R. 42(A) precedent, rather than in conflict with it.

## 2. *Common Question of Fact*

**{¶63}** We next consider the meaning of Civ.R. 42(A)'s "common question of fact" standard. Without expressly defining that phrase, we have held in previous Durrani cases that plaintiffs who receive the same or similar surgeries or present their cases through identical expert testimony may join their claims for trial. *See, e.g., Fenner v. Durrani*, 2025-Ohio-4477, ¶ 49 (1st Dist.). In doing so, we have focused on the efficiency purposes underlying Civ.R. 42(A). *See, e.g., Courtney*, 2025-Ohio-2335,

at ¶ 52 (1st Dist.) ("consolidation under Civ.R. 42(A) is essentially a docket-management technique"). Whether cases rely upon a similar factual presentation is certainly relevant to a trial court's consolidation determination once a common question of fact has been established. At the second step of the Civ.R. 42(A) inquiry, focusing on how the parties will present their cases helps a trial court assess whether joinder for trial makes practical sense.

**{¶64}** But the fact that actions rely upon common witnesses should not be confused for the separate inquiry into whether the actions present a common factual question. To determine whether such a common question of fact exists, we must first understand what the term "common question of fact" means in the context of Civ.R. 42(A).

**{¶65}** Neither the rule itself nor any Ohio case law expressly defines the term. We therefore turn again to analogous provisions in other rules for guidance, one of which is Civ.R. 23(A). For class action purposes under that rule, factual commonality exists where there is a "common nucleus of operative facts." *Chambers v. Farmers Ins. of Columbus, Inc.*, 2025-Ohio-5, ¶ 32 (8th Dist.). The word "operative" is key here. "[C]ommon facts alone are not sufficient unless they have legal significance." *Berdysz v. Boyas Excavating, Inc.*, 2017-Ohio-530, ¶ 28 (8th Dist.). In other words, the common factual question must uniformly apply to a common cause of action. *Davenport v. Progressive Direct Ins.*, 2025-Ohio-2449, ¶ 29 (8th Dist.).

**{¶66}** Interpreting the analogous commonality standard in Fed.R.Civ.P. 23(A), the United States Supreme Court recently agreed. *See Wal-Mart Stores, Inc. v.*

*Dukes*, 564 U.S. 338 (2011).[10] Its opinion in *Wal-Mart* made two important contributions to what constitutes a common question of law. First, to meet this standard, the plaintiffs' claims must "depend upon a common contention." *Wal-Mart* at 350. One example that would satisfy this requirement is the allegation by a group of employees that the same supervisor treated them with discriminatory bias. *Id.* But merely making a common allegation against a defendant is not enough. In addition, the common contention "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* In other words, "what matters . . . is not the raising of common questions—even in droves—but, rather, the capacity of a classwide proceeding to generate common *answers.*" (Emphasis in original.) *Id.*

{¶67}    Applying these principles, the Supreme Court in *Wal-Mart* reversed the lower courts' certification of a class of employees who sued Wal-Mart for alleged sex discrimination. *Id.* at 359-360. The employees' individual claims that they had been underpaid or passed over for promotions as compared to their male counterparts were not susceptible to a single, common resolution, given that no evidence established a company-wide policy to discriminate based on gender. *Id.* As a result, the employees could not establish commonality, because their claims were not subject to common resolution.

{¶68}    The facts we are looking for are therefore material facts capable of being

---

[10] As we have noted, ordinary principles of statutory construction afford phrases the same meaning when used across multiple rules, so Fed.R.Civ.P. 23(A) is analogous to the federal consolidation rule's use of the common-question language. *See, e.g., Schreiber v. Cuccinelli,* 981 F.3d 766, 774-775 (10th Cir. 2020) (describing principle of statutory construction known as natural presumption, which suggests that identical words within different provisions of the same law are intended to have the same meaning).

resolved at one time. We think this is what the *Kleines* Court meant when it observed that merely being related was insufficient for property owners' appropriations cases to be consolidated. *See Kleines*, 38 Ohio St.2d at 320. The question of whether the property owners were related was certainly a factual one. But it was not a material question in the case, as it did not resolve any element of the highway director's appropriations claims. *Id.* And it could not be resolved in common for all of the property owners. *Id.* Thus, there was no common question of fact capable of expedient resolution by way of Civ.R. 42(A). *Id.*

{¶69} This is not to ignore our precedent regarding the relevance of how similar the plaintiffs' presentation of evidence will be. That remains a consideration in the trial court's decision to join cases for trial once a common question has been established. *See, e.g., Ravenscraft v. Durrani*, 2025-Ohio-2900, ¶ 88 (1st Dist.). But, for the reasons we have explained, in this case we also query whether a material question of fact could be answered in common across all three plaintiffs' cases.

### 3. *Improper Joinder*

{¶70} Applying these principles to Wilson, Crail, and Smith's trial, we begin with the nature of the trial court's ruling. Why did the trial court join these three cases for trial? The record before us is sparse on the answer. The plaintiffs' names do not appear on the list of proposed cases attached to the motion for group trials, and they were not mentioned together in other documents filed in the trial court until its January 4, 2023 order scheduling their October 30, 2023 trial date. When Durrani objected to their cases being jointly tried, the trial court merely focused on the fact that Durrani would have experts in common across the cases and indicated that trying trials against Durrani one by one would take too long, given the volume of lawsuits against him. When Durrani again raised the issue post-verdict, the trial court denied

25

relief because the issues and parties were sufficiently common, the experts were identical, and the jury individually considered each plaintiff's case. We thus approach the question of whether the trial court abused its discretion in joining the plaintiffs' cases with an awareness that the trial court offered only a very basic explanation for its decision.

{¶71} Beginning with the common-question-of-law standard, we see no legal question capable of common resolution with a single "yes" or "no" answer in the plaintiffs' cases. Wilson, Crail, and Smith each raised the same four claims against Durrani: negligence, battery, fraudulent misrepresentation, and lack of informed consent. Notably, each plaintiff's complaint was premised on allegations about Durrani's individualized treatment, rather than a common scheme. The negligence claims alleged that Durrani owed each "patient, Plaintiff, the duty to exercise the degree of skill, care, and diligence an ordinarily prudent health care provider would have exercised" and that Durrani breached the duty by negligently diagnosing, mismanaging, and mistreating each patient. Similarly, the battery counts alleged that Durrani "committed a battery against Plaintiff by performing a surgery that was unnecessary." As for the lack of informed consent, each plaintiff contended that the consent forms Durrani presented them were inadequate because they had individually been uninformed about their unique surgeries. And as to fraud, the plaintiffs claimed that Durrani made "material, false representations to Plaintiff" to induce each patient to undergo surgery.

{¶72} Because the claims were particularized to each plaintiff, they were not in common across the actions within the meaning of Civ.R. 42(A), as an element-by-element analysis reveals. Beginning with negligence, the plaintiffs were required to prove (1) a duty, (2) a breach of that duty, and (3) an injury caused by the breach.

*Cincinnati Bell Tel. Co. v. J.K. Meurer Corp.*, 2022-Ohio-540, ¶ 22 (1st Dist.). None of these elements of this tort were capable of a single "yes" or "no" answer for all of the plaintiffs. The duty of care Durrani owed Wilson, Crail, and Smith was dependent upon their status as patients, which each plaintiff needed to individually establish. Whether Durrani breached the duty of care he owed each patient was also incapable of common resolution, as the answer to that question depended on individualized review of each patient's radiological images to determine if they actually needed surgery. Each plaintiff also relied on unique evidence to establish Durrani's breach, thereby destroying commonality. *See Neri*, 122 F.4th at 247. On an individual basis, the plaintiffs' experts each separately opined that they had reviewed the plaintiffs' radiological images and medical files and had determined that surgery was not medicinally necessary for each patient.[11] And finally, the plaintiffs all suffered separate injuries. Wilson was left with permanent scar tissue, Crail required a spinal stimulator to manage pain, and Smith developed a chemical dependency. The plaintiffs' negligence claims were therefore distinct, not common. *See Wal-Mart*, 564 U.S. at 351 (requiring "a common answer to the crucial question *why was I disfavored*" to satisfy the commonality requirement (Emphasis in original.)).

{¶73} The same can be said for the plaintiffs' fraud, battery, and lack of informed consent claims. None of these claims were capable of uniform resolution across the plaintiffs' cases, as one plaintiff's proof could not provide the answer to another plaintiff's claim. Whether Durrani in fact fraudulently misrepresented the need for surgery and therefore lacked adequate informed consent turned in each case on the patient's particular medical condition. In fact, the trial court instructed the jury

---

[11] Dr. Bloomfield only testified in Wilson's and Crail's cases.

as much, indicating that "while the instructions will collectively refer to Plaintiffs, your analysis must be as to each individual Plaintiff and their individual claims." *See Ravenscraft*, 2025-Ohio-2900, at ¶ 90 (1st Dist.) (describing jury instruction).

**{¶74}** We need look no further than the jury's verdicts in this case for confirmation of that conclusion. The jury sided with Wilson on her battery, fraudulent misrepresentation, and lack of informed consent claims, but sided with Durrani on those claims in Crail's and Smith's cases. Not only were the claims *capable* of distinct "yes" and "no" answers, but they were actually resolved differently. There is no better evidence against commonality than that.[12]

**{¶75}** Moving to whether a common question of fact tied the plaintiffs' cases together, we again see none. True, the plaintiffs all had diagnoses related to their spines and all underwent various forms of spinal surgery. They all even had problems at some point in the lumbar areas of their backs. But the questions of what body part Durrani surgically corrected or what type of surgery the plaintiffs underwent do not materially affect any element of the plaintiffs' four claims. Durrani could be negligent or could commit a battery whether he operated on the plaintiffs' backs, arms, or brains.

**{¶76}** In reaching this conclusion, we highlight the lack of a single witness or piece of evidence that established any key fact in dispute. *See Neri*, 122 F.4th at 247 (observing that variation in the evidence used to prove a common answer will destroy commonality). A critical factual question across all of the plaintiffs' claims was whether they needed surgery. But no one piece of evidence could answer that question, as the necessity of each person's surgery depended on facts about their

---

[12] We recognize that the trial court would not have had the benefit of the jury's verdicts in determining whether to consolidate the plaintiffs' cases before trial. But the trial court was aware of the jury's verdicts in denying Durrani's JNOV motion, which raised the Civ.R. 42(A) issue anew as a basis for a new trial.

medical conditions that were not in common within the meaning of Civ.R. 42(A). Dr. Saini, for example, testified that he reviewed the plaintiffs' radiological images and that, in his expert opinion, none of them required surgery. But he did so by methodically addressing each patient's unique medical condition and opining as to whether each person's injuries warranted surgical intervention. So too for Drs. Bloomfield, Wilkey, and McCormick. The variation in proof needed to prove each plaintiff's claims undermines that their factual allegations were in common.

{¶77} This point emphasizes the relationship between the first and second steps of the Civ.R. 42(A) inquiry. Consolidation is efficient where a common question can be answered by common proof. But a trial is no more efficient when evidence that would be required in individual trials is merely presented in sequence in a consolidated trial. Because there was no common question here, the trial court abused its discretion in joining the plaintiffs' claims for trial. *See Kleines*, 38 Ohio St.2d at 320.

{¶78} This is not to say that common facts can never exist in cases against Durrani or other physicians accused of coercing patients into unnecessary surgeries. Cases like *Siuda*, in which a doctor performs an allegedly defective surgical technique on multiple patients, seem ripe for consolidation, given that the validity of the technique could be answered in common across all of the actions. *See Siuda*, 2002-Ohio-2292, at ¶ 12, 16 (1st Dist.). In addition, *Siuda*'s conspiracy claim was also capable of common resolution, a proposition courts outside of Ohio agree can form the basis of proper joinder under Civ.R. 42. *See, e.g., Rio Grande Valley Gas Co. v. City of Pharr*, 962 S.W.2d 631, 643 (Tex.App. 1997). We reiterate that so long as the factual question is material and capable of uniform resolution through at least some common proof, cases can be consolidated within the discretion of the trial court—be

they against Durrani or any other defendant.

{¶79} Even a straightforward application of our existing precedent produces the same outcome, as the plaintiffs' cases lack the same degree of commonality that has warranted joinder in other Durrani cases. For example, we have upheld joint trials where the plaintiffs suffered from similar spinal conditions, underwent similar surgeries, or presented identical expert testimony. *See Boggs v. Durrani*, 2026-Ohio-210, ¶ 67 (1st Dist.); *Fenner*, 2025-Ohio-4477, at ¶ 49 (1st Dist.). But those factors are not present here.

{¶80} None of the plaintiffs received the same surgical procedure, and the plaintiffs' conditions affected different parts of the spine. Crail underwent an anterior cervical discectomy at the C3/C4, C4/C5, and C7/T1 levels and a bilateral lumbar hemilaminectomy at the L4/L5 level. Smith had a laminectomy and foraminotomy. Wilson had a lumbar fusion at the L4/L5 level, an L5/S1 fusion and foraminotomy, a hemilaminectomy and foraminotomy at the L3/L4 and L5/S1 levels, and a fourth surgery to remove a tube from her hand. On Crail and Wilson, Durrani performed multiple surgeries. On Smith, Durrani only performed one.

{¶81} The nature of the plaintiffs' damages was also different. The primary damage Smith suffered as a result of Durrani's negligence was that he developed an addiction to pain medication, while Crail required the insertion of a spinal cord stimulator to control his pain, and Wilson required ongoing pain management arising from her permanent scar tissue.

{¶82} Crail and Wilson also presented additional expert testimony beyond that presented by Smith. Dr. Bloomfield testified that Crail and Wilson were in worse condition after Durrani operated than before. He opined that Durrani caused acute, chronic, and permanent damage to Crail's spine and also permanently altered Wilson's

spine, particularly at the site of the fusion. He did not testify in Smith's case.

{¶83} The plaintiffs' cases therefore lack the character of the cases that have supported consolidation. We agree with Durrani that joining the plaintiffs' cases for trial was an abuse of discretion.

### B. Harmless Error

{¶84} Because we agree with Durrani that the joining of the plaintiffs' trials under Civ.R. 42 was improper, we now must decide whether the trial court's decision to join the plaintiffs' claims constituted harmless error.

{¶85} Civ.R. 61 sets forth the civil harmless-error rule. Pursuant to that standard, no error or defect in any ruling or order by the trial court is grounds for a new trial or for setting aside a jury's verdict unless refusing such relief is "inconsistent with substantial justice." Civ.R. 61. In determining whether substantial justice was done, we "must weigh the prejudicial effect of the errors and determine whether the trier of fact would have reached the same conclusion had the errors not occurred." *Setters v. Durrani*, 2020-Ohio-6859, ¶ 22 (1st Dist.). We accordingly consider whether the trial court's error in joining the plaintiffs' cases for trial prejudiced Durrani.

{¶86} As the appellant, Durrani bears the burden of demonstrating the improper joinder of the plaintiffs' cases for trial was not harmless. *See Osborne v. Osborne*, 2015-Ohio-2510, ¶ 35 (4th Dist.). In analyzing harmless error, we accordingly confine our review to matters that Durrani has brought to our attention.

{¶87} As a general proposition, Durrani argues that joining the plaintiffs' cases for trial was inherently prejudicial. Pointing to the potential for inadmissible evidence to be considered by the jury, Durrani contends that facts about Wilson's case unfairly tainted the jury's consideration of Crail's and Smith's cases, and vice versa.

But we have rejected this generic prejudice argument in the past, noting that "any consolidation of trials will certainly result in some prejudice." *Courtney*, 2025-Ohio-2335, at ¶ 57 (1st Dist.).

**{¶88}** We nevertheless agree that, on this record, Durrani was deprived of substantial justice by the joinder of Wilson's, Crail's, and Smith's cases for trial. In reaching this outcome, we are conscious of the fundamental role of the jury. *See* Ohio Const. art. I, § 5 ("The right of a trial by jury shall be inviolate. . . ."). Indeed, errors in selecting and seating a jury are typically structural and do not lend themselves well to harmless-error analysis. *See, e.g., Vasquez v. Hillery*, 474 U.S. 254 (1986) (establishing that errors in jury selection are structural and not subject to harmless-error analysis).

**{¶89}** Durrani more specifically points us to several considerations that indicate that, in this specific case, joinder was not harmless. First, he highlights the jury's split verdicts: Wilson prevailed in all of her claims against Durrani but with differing numbers of jurors in her favor on some of the claims, and Crail and Smith only prevailed on their negligence claims but by a differing vote. Therefore, no plaintiff fully prevailed on all claims before a unanimous jury. That means that on at least some aspects of the plaintiffs' presentation, the jury had doubts.

**{¶90}** Second, we observe that the jury's overall damages awards do not meaningfully correspond to the evidence or to the plaintiffs' claims, a point Durrani made by emphasizing that Smith had the fewest number of surgeries but was awarded the highest monetary damage award. The central argument all three plaintiffs advanced at trial was that Durrani coerced them to undergo medically unnecessary spine surgeries. Wilson incurred three such surgeries, Crail two, and Smith one. Smith's surgery was the least invasive, and he had the lowest amount of medical

expenses. Smith's case was also the closest—only six jurors voted in favor of finding Durrani liable for negligence. And, unlike Crail, whom the jury found to suffer a permanent physical deformity, and Wilson, who had lasting scar tissue in her spine, Smith suffered no enduring physical injuries as a result of Durrani's surgery. But the jury awarded Smith the highest monetary damages award by a significant margin— $1,628,756.70 for Smith to Crail's $934,703.10 and Wilson's $801,085.41.

**{¶91}** Third, the jury's awards for future loss of enjoyment for each plaintiff also reveal possible contamination across cases, a point Durrani invited us to explore by pointing us to damages awards in Wilson's and Smith's cases. The jury awarded Crail $710,000 for future loss of enjoyment and Smith $420,000 for the same damage. But Wilson received no monetary award in this category, despite her testimony that she continued to see a pain management physician for ongoing pain while being the sole caretaker of two children. At the time of trial, Crail was 67 years old, Smith was 51 years old, and Wilson was 59 years old. The fact that Crail, who was the oldest at the time of trial, was awarded the highest amount for future loss of enjoyment, while Wilson, who endured the most surgeries and was solely taking care of two children, received no award suggests that the jury confused the facts of the plaintiffs' cases.

**{¶92}** Fourth, the jury found in favor of Wilson on all of her claims against Durrani, while rejecting some of Crail's and Smith's claims. The strength of Wilson's case against Durrani compared to Crail's and Smith's did not translate to the jury's damages awards. Instead, the jurors appear to have sympathized with Smith, who testified from in-patient rehab as a result of the chemical dependency he developed from Durrani's treatment, a point Durrani emphasizes in his argument against harmlessness. Comparing Wilson's and Crail's lasting physical problems to Smith's psychological one appears to have caused the jury to undervalue Crail's and Wilson's

physical injuries.

{¶93}    Therefore, given the conflicts between the jury's verdicts as to liability and its damages awards and the jury's split verdicts, we cannot discount the likelihood that the jury would have reached different conclusions had the plaintiffs' trials been separated.    We accordingly sustain Durrani's assignment of error, reverse the judgment of the trial court, and remand the cause for individual trials.

{¶94}    We decline to consider Durrani's remaining nine assignments of error, as they are moot.

{¶95}    We applaud the trial court for its efforts to manage the high volume of cases against Durrani efficiently and effectively.  But Civ.R. 42(A) does not permit consolidation of the plaintiffs' cases here, as no common question of law or fact binds these plaintiffs' cases together.  The judgment of the trial court is reversed, and the causes are remanded for new trials consistent with this opinion.

Judgments reversed and cause remanded.

NESTOR. J., concurs.
MOORE, J., dissents.

MOORE. J., dissenting.

{¶96}  As the majority points out, Civ.R. 23 and 42 (and their federal twins) rely on the existence of common questions of law or fact as a prerequisite to the recognition of a class—in the case of Civ.R. 23—or to support the decision to consolidate—in cases invoking Civ.R. 42.

{¶97}  The majority cites the principle of natural presumption, which is the tenet of statutory interpretation that provides that a term used repeatedly throughout a rule is presumed to have the same meaning, absent some indication that the drafter intended a different message. Majority opinion at ¶ 55, 66,  citing *State ex. rel.*

*Daniels*, 2025-Ohio-3058, at ¶ 50 (1st Dist.); *Schreiber v. Cuccinelli*, 981 F.3d 766, 774-775 (10th Cir. 2020). The majority then concludes that they "have no evidence that the common question standard means something different in Civ.R. 23(A) than it means in Civ.R. 42(A) . . . ." *Id.* at ¶ 55. It is on this point that I find myself at odds with my colleagues in the majority.

**{¶98}** While it is true that both rules require common questions of law or fact as a qualifying condition, this common term does not have a common meaning because these two rules do not serve a common purpose. As a result, the application of the principle of natural presumption relied on by the majority is inapplicable here. And, because Civ.R. 23 does not equal Civ.R. 42, I must dissent.

### *Two Rules – Two Different Purposes*

### *A.  Civ.R. 42 Brings Together Separate Lawsuits for the Purposes of Efficient Judicial Administration*

**{¶99}** Civ.R. 42 is primarily intended as a case-management tool. *See, e.g., Courtney*, 2025-Ohio-2335, at ¶ 52 (1st Dist.) ("consolidation under Civ.R. 42(A) is essentially a docket-management technique."); *Kleines*, 38 Ohio St.2d at 319-320 ("The thrust of Civ.R. 42(A) is to vest discretion in the Court of Common Pleas to determine whether consolidation of cases is to be permitted where the circumstances specified in the rule exists. The purpose of the rule is to avoid unnecessary costs or delay in the interests of judicial efficiency.").

**{¶100}** These positions are consistent with the United States Supreme Court's view of Fed.R.Civ.P.  42. The Court has explained that "consolidation is permitted as a matter of convenience and economy in administration, but does not merge the suits into a single case, or change the rights of the parties, or make those who are parties in one suit parties in another." *Hall v. Hall*, 584 U.S. 59, 70 (2018), citing *Johnson v.*

*Manhattan Ry. Co.*, 289 U.S. 479, 496 (1933). Judge Learned Hand, in writing for the Second Circuit in *Johnson*, underscored that "consolidation does not merge the suits; it is a mere matter of convenience in administration, to keep them in step. They remain as independent as before." *Id.*, citing *Johnson v. Manhattan Ry. Co.*, 61 F.2d 934, 936 (2d Cir. 1932).

**{¶101}** Other federal court cases have echoed this point. In *Chaara v. Intel Corp.*, 410 F.Supp.2d 1080, 1094 (D.N.M. 2005), the court opined "Consolidation is not like a marriage, producing one indissoluble union from two distinct cases. Instead, consolidation is an artificial link forged by a court for the administrative convenience of the parties; it fails to erase the fact that, underneath consolidation's façade, lie two individual cases." In *Norton Lilly Internatl. v. Puerto Rico Ports Auth.*, 2019 U.S. Dist. LEXIS 240524, *4 (D.P.R. May 16, 2019), the court emphasized the purpose of consolidation is to avoid: "(1) overlapping trials containing duplicative proof; (2) excess cost incurred by all parties and the government; (3) the waste of valuable court time in the trial of repetitive claims; and (4) the burden placed on a new judge in gaining familiarity with the cases." *Id.*, citing *Arroyo v. Chardon*, 90 F.R.D. 603, 605 (D.P.R. 1981); *In re Viatron Computer Systems Corp. Litigation*, 86 F.R.D. 431 (D.Mass. 1980).

**{¶102}** Thus, "the obvious purpose of Rule 42(A) is for the convenience of trial, for preventing multiplicity of actions, and for the saving of costs." *Givens v. Longwell*, 2024-Ohio-947, ¶ 34 (7th Dist.), citing *Monus v. Day*, 2011-Ohio-3170, ¶ 74 (7th Dist.), quoting Civ.R. 42(A), Staff Notes (1970). The purpose of Civ.R. 23 is different.

### B. *Civ.R. 23 Consolidates Separate Claims into a Single Lawsuit*

**{¶103}** Unlike Fed.R.Civ.P. 42, the purpose of Fed.R.Civ.P. 23 is to allow for the prompt resolution of claims and to avoid repetitive litigation. *Califano v. Yamasaki*,

442 U.S. 682, 700-701 (1979). To further this purpose, Fed.R.Civ.P. 23 permits the creation of a representative suit. *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 550 (1970). This is distinct from Fed.R.Civ.P. 42, as consolidation under Fed.R.Civ.P. 42 has the limited effect of coupling the presentation of cases, not the merger of actions. As a result of its specific purpose, class actions have always been treated as special. *Blue Cross Blue Shield of Mass. v. BCS Ins. Co.*, 671 F.3d 635, 640 (7th Cir. 2011).

**{¶104}** In *Blue Cross Blue Shield of Massachusetts,* the court explained that Fed.R.Civ.P. 23 and 42 should be treated differently because of the different purposes they serve:

> As a practical matter the representative's small stake means that lawyers are in charge, which creates a further need for the adjudicator to protect the class. Finally, class actions can turn a small claim into a whopping one. Unsurprisingly, Fed. R. Civ. P. 23 imposes stringent requirements on class certification. Consolidation of suits that are going to proceed anyway poses none of these potential problems. That's why Fed. R. Civ. P. 42(a) leaves to a district judge's discretion—and without any of Rule 23's procedures and safeguards—the decision whether to consolidate multiple suits.

*Id.* at 640.

**{¶105}** The class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano* at 700-701. To justify a departure from that rule, "a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *E. Texas Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977), quoting *Schlesinger v. Reservists Commt. to Stop the War*, 418 U.S. 208, 216 (1974).

Fed.R.Civ.P. 23(a) ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate. The Rule's four requirements—numerosity, commonality, typicality, and adequate representation—"effectively 'limit the class claims to those fairly encompassed by the named plaintiff's claims.'" *Wal-Mart Stores*, 564 U.S. at 349, quoting *General Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 156 (1982).

{¶106} As the majority explains, in *Wal-Mart Stores, Inc.*, the Supreme Court held that for there to be a basis for a class action under Fed.R.Civ.P. 23, the claims must depend upon a common contention. *Id.* at 350. "That common contention, moreover, must be of such a nature that it is capable of class wide resolution--which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* Such is not the case under Fed.R.Civ.P. 42.

{¶107} Under Fed.R.Civ.P. 42, consolidated cases retain their separateness, and therefore, the same concerns that mandate a "rigorous analysis" of the commonality of the claims and the ability to answer common questions in one stroke does not exist with cases consolidated under Fed.R.Civ.P. 42.

{¶108} Unlike decisions with respect to granting class certification under Fed.R.Civ.P. 23, when deciding whether to exercise their discretion in granting a motion to consolidate under Fed.R.Civ.P. 42, "courts weigh considerations of convenience and economy against considerations of confusion and prejudice." *Pino-Betancourt v. Hosp. Pavia Santurce*, 928 F. Supp.2d 393, 395 (D.P.R. 2013), quoting *Am. Postal Workers Union v. United States Postal Serv.*, 422 F.Supp.2d 240, 245 (D.D.C. 2006).

{¶109} Thus, while cases consolidated under Fed.R.Civ.P. 42 maintain their

separateness, the class action under Fed.R.Civ.P. 23 is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano*, 442 U.S. at 700-701. Because of the difference in both purpose and function of these two rules, the words used in each rule also serve a different purpose and function, which makes the application of one to the other inappropriate. Civ.R. 42 brings together existing litigants for purposes of efficiency; Civ.R. 23 brings together people with similar claims, including those that have not chosen to pursue litigation. The stakes are different and therefore so is the criteria. And the criteria for finding commonality under Civ.R. 23 is more rigorous than what Civ.R. 42 requires.

{¶110} The instant cases are not class actions, and therefore, the requirement that consolidation must result in a single answer for common questions does not apply since the claims remain separate. So, for example, a determination that defendants were liable to one plaintiff does not determine that they were liable to the other. Yet, the trial court may still consolidate these cases for purposes of docket management if there are legal or factual similarities sufficient to justify taking advantage of Civ.R. 42 without unduly prejudicing the parties.

{¶111} Because of the different purposes behind the two rules, the principle of natural presumption relied on by the majority is not applicable here. There is, however, another principle that is.

{¶112} The omitted-case canon provides that courts generally should not add language to cover something the legislature left out. *See Reese v. Bur. of Alcohol*, 127 F.4th 583, 591 (5th Cir. 2025), citing Antonin Scalia and Bryan Garner, *Reading Law: The Interpretation of Legal Texts*, 93-100 (2012) (referencing the "the omitted-case canon – the principle that what a text does not provide is unprovided."); *Briseno v. ConAgra, Inc.*, 844 F.3d 1121, 1125-1126 (9th Cir.) (interpreting an omission within

Fed.R.Civ.P. 23 for concerns of administrative feasibility as an intentional omission, because we presume Congress acts intentionally, and that courts should not "interpose an additional hurdle" when the rule fails to do so). Applying this principle to assist with our interpretations of Civ.R. 23 and 42 allows us to conclude that the drafters of Civ.R. 42 knew how to make the requirements of consolidation just as rigorous as those for class certification, but chose not to. Under this principle, we must therefore assume that this was done intentionally and this court should not write a requirement into Civ.R. 42 that the drafters apparently, based on their omission, did not intend.

**{¶113}** Because the rules serve different purposes, it is inappropriate to graft the interpretation of commonality for class actions onto the branch of the civil rules intended to address consolidation. I am concerned that by applying Civ.R. 23 standards to Civ.R. 42 situations, we run the risk of unnecessarily restricting the trial court's ability to determine what is the best option for managing its docket.

### *How is Commonality to be Defined*

**{¶114}** I recognize that the analysis above does not address the key question the majority has attempted to answer—how is commonality defined. Unfortunately, I can provide little help with that effort. And, I would argue that we should not try. The determination of what level of commonality is sufficient to justify consolidation was not explained in the rule and we should avoid doing so here. Instead, that determination should be left to the trial courts, which are in the best position to determine how to most efficiently manage the cases on their dockets. But those decisions must be explained on the record.

**{¶115}** To allow for an appellate court to determine whether the trial court has properly exercised its discretion, the trial court must articulate on the record the basis for its conclusion that consolidation is appropriate. *See State v. Yu*, 2024-Ohio-3083,

¶ 13 (1st Dist.) (holding where the trial court offers no reasons for its denial of an application for expungement, the appellate court cannot blindly defer to the trial court's unexplained exercise of discretion), citing *State v. M.D.*, 2009-Ohio-5694, ¶ 19, 21 (8th Dist.). A failure to do so, would prevent a reviewing court from discerning a trial court's reasoning and likely result in a finding that the decision was unreasonable, arbitrary, or unconscionable and therefore an abuse of discretion.

**{¶116}** Another question the majority seeks to address is how an appellate court will be able to determine if the trial court's explanation is sufficient. A valid question, but one that has already been answered by courts reviewing consolidation decisions before now. For example, in *In re Cletus P. & Mary A. McCauley Irrevocable Trust*, 2014-Ohio-5123, ¶ 16 (5th Dist.), the appellate court was able to determine that there had been no abuse of discretion where the trial court explained that consolidation was appropriate based on its determination that the two cases were identical or closely related. Specifically, the trial court explained that both cases included a demand for an accounting, a demand for distribution, an alleged breach of fiduciary duty, and a request for removal of the trustee. *Id.*

**{¶117}** Thus, the way that appellate courts are going to be able tell if a trial court's decision makes sense is by reviewing the record, and if that record is "devoid of any evidence" to support the trial court's decision, then the trial court has abused its discretion. On the other hand, if the trial court's explanation is not unreasonable, arbitrary, or unconscionable, then appellate courts must defer to the trial court's exercise of the discretion it has been given under Civ.R. 42. Appellate courts have proven themselves up to this task without the need for the significant change in the interpretation of Civ.R. 42 that the majority is introducing.

**{¶118}** Civ.R. 23 and 42 serve different purposes. One is a tool used to manage

claims, the other is a tool for trial courts to use under appropriate circumstances to efficiently manage their dockets. Because of these differing purposes, cases interpreting one rule should not be applied to the other.

### *Harmless Error*

**{¶119}** The majority does a detailed and thorough analysis of the jury's verdicts and its findings leading up to those verdicts. At the conclusion of this analysis, the majority concludes that based on discrepancies it found in the jury's findings and the verdicts, the jury was impacted by the consolidation of these cases to such a degree that it caused unfair prejudice to the defendants. Because the majority's finding is not based on what can be gleaned from the face of the record, but instead on what it reads into that record, I must dissent on this point as well.

**{¶120}** R.C. 2309.59 provides that "In every stage of an action, the court shall disregard any error or defect in the pleadings or proceedings which does not affect the substantial rights of the adverse party. No final judgment or decree shall be reversed or affected by reason of such error or defect." Civ.R. 61 parrots this sentiment and provides that courts must disregard errors that do not affect the substantial rights of the parties. Further, "[t]o find that substantial justice has not been done, a court must find (1) errors and (2) that without those errors, the jury probably would not have arrived at the same verdict." *Hayward v. Summa Health Sys.*, 2014-Ohio-1913, ¶ 25, citing *Hallworth v. Republic Steel Corp.*, 153 Ohio St. 349 (1950), paragraph three of the syllabus. In determining whether prejudicial error exists, we are "bound by the disclosures of the record." *Id.*, quoting *Makranczy v. Gelfand*, 109 Ohio St. 325, 329 (1924).

**{¶121}** In *Hess v. Norfolk S. Ry. Co*, 2003-Ohio-4172, ¶ 31 (8th Dist.), *rev'd in part on other grounds*, 2005-Ohio-5408, ¶ 48-49, which was a consolidated trial

under Civ.R. 42(A), the court held appellant's challenge to the consolidation of trials unpersuasive. The court in relevant part stated,

> Absent a showing of evidence to the contrary, we dismiss appellant's hypothetical assertions about how a juror could have been confused during trial. Appellant asserts that presenting four cases of lung cancer to the same jury predisposes the jury to find causation regardless of the evidence. Also, a juror might miss an important point while taking notes, write down the wrong note, or give undue emphasis to certain points written down while in deliberations. Appellant's hypothetical assertions attack the intelligence of jurors which form the basis of our legal system.

*Id.* at ¶ 31. As explained in *Hess*, a reviewing court should not rely on hypothetical assertions about how a juror could have been confused during trial. Instead, in determining whether prejudicial error exists, this court must remain "bound by the disclosures of the record." *Hayward* at ¶ 25.

{¶122} Here, nothing that the majority has said can fairly be seen as attacking the intelligence of jurors. However, it is troubling that the finding of actual prejudice is based on the majority's post-mortem analysis and its effort to decipher meaning from the jury's conclusions and not from what is obvious from the face of the record.

{¶123} Before a reviewing court should step in and challenge the ability of jurors to do what they were asked to do, there must be clear evidence on the face of the record that demonstrates that for some reason the jurors were not able to carry out their assigned task. It is only under such circumstances that a reviewing court should find that the consolidation decision resulted in actual undue prejudice. An examination of the damages awarded and speculation as to how the jurors may have

negotiated that outcome among themselves during deliberations, no matter how carefully performed, is in the end mere speculation. And absent actual evidence that is clear on the face of the record, speculation of what might have happened is not enough to reverse what actually did.

{¶124} I therefore must disagree with the majority's finding of undue prejudice because it is not based on what is clear from the record, but is derived from what the majority divines from the record.

{¶125} Applying the more restrictive requirements of class certification to the trial court's ability to consolidate cases risks taking away, or at least hampering, the trial court's ability to use this important tool as intended. In the end, we do not need to provide the trial courts with a specific definition of what is meant by "common questions of law or fact" or how much in common do the questions or law or fact need to be. Instead, we need to trust that the trial courts will properly use their discretion and judiciously apply Civ.R. 42 as the docket-management tool it was meant to be. And, we have to trust that the trial court appreciates that if its decision to consolidate proves an abuse of discretion that results in demonstrable harm, a retrial would only make worse the problem that they are trying to use Civ.R. 42 to fix.